UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEBRA LEE ARMATA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:17-cv-30054-KAR |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF
THE COMMISSIONER
(Docket Nos. 15 & 19)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION

Debra Lee Armata ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) seeking

review of a final decision of the Acting Commissioner of Social Security ("Commissioner")

denying her application for Social Security Disability Insurance Benefits ("DIB").  Plaintiff

applied for DIB on December 3, 2013, alleging a June 22, 2013 onset of disability, due to

problems stemming from a variety of impairments, including:  blind spots in her left eye; high

blood pressure; a stroke; a heart attack; diabetes; neuropathy; and headaches  (A.R. at 183, 360).[1]

On February 26, 2016, the Administrative Law Judge ("ALJ") found that Plaintiff was not

disabled and denied her application for DIB and SSI (*id*. at 183-198).  The Appeals Council

---

[1] A copy of the Administrative Record (referred to herein as "A.R.") has been provided to the
court under seal (Dkt. No. 10).

denied review (*id.* at 1-4) and thus, the ALJ's decision became the final decision of the Commissioner.  This appeal followed.

Plaintiff appeals the Commissioner's denial of her claim on the ground that the decision is not supported by "substantial evidence" under 42 U.S.C. § 405(g).  Pending before this court are Plaintiff's motion for judgment on the pleadings requesting that the Commissioner's decision be reversed or remanded for further proceedings (Dkt. No. 15), and the Commissioner's motion for an order affirming the decision of the ALJ (Dkt. No. 19).  The parties have consented to this court's jurisdiction (Dkt. No. 14).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons stated below, the court DENIES in part the Commissioner's motion for an order affirming the decision and GRANTS in part Plaintiff's motion for remand.

II.   LEGAL STANDARDS

A.   Standard for Entitlement to Disability Insurance Benefits and Supplemental Security Income

In order to qualify for DIB, a claimant must demonstrate that she is disabled within the meaning of the Social Security Act.[2]  A claimant is disabled for purposes of DIB if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  A claimant is unable to engage in any substantial gainful activity when she

> is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

---

[2] There is no challenge to Plaintiff's insured status for purposes of entitlement to DIB.  *See* 42 U.S.C. § 423(a)(1)(A).

2

42 U.S.C. § 423(d)(2)(A). The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration ("SSA"). *See* 20 C.F.R. § 404.1520(a)(4)(i-v). The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from dong any work considering the claimant's age, education, and work experience. *See id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process). If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. 20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's RFC, which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work. *See id.*

> RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities

Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate RFC. *Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th

Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding his or her restrictions and limitations.  *Goodermote*, 690 F.2d at 7.

B.     Standard of Review

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).  The court reviews questions of law *de novo*, but must defer to the ALJ's findings of fact if they are supported by substantial evidence.  *Id.* (citing *Nguyen v. Chater,* 172 F.3d 31, 35 (1st Cir. 1999) (per curiam)).  Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'"  *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)).  "While 'substantial evidence' is 'more than a scintilla,' it certainly does not approach the preponderance-of-the-evidence standard normally found in civil cases."  *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (citing *Sprague v. Dir., Office of Workers' Comp. Programs*, *U.S. Dep't of Labor*, 688 F.2d 862, 865 (1st Cir. 1982)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence.  *See Irlanda Ortiz*, 955 F.2d at 769.  So long as the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably

could support a different conclusion." *Id.* at 770. That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts. *Nguyen*, 172 F.3d at 35.

III.    FACTS

A.    Plaintiff's Background

At the time of the hearing before the ALJ in November 2015, Plaintiff was 59 years old and lived with her husband and her 34 year old son (A.R. at 209-10). She attended one year of college and worked full-time as a payroll clerk and as a dispatcher for trucking companies (*id.* at 197, 209-13). She had not worked since June 2013 (*id.* at 210).

B.    Plaintiff's Physical Condition

On May 3, 2012, Plaintiff was admitted to the Mercy Medical Center due to a "non-q-wave myocardial infarction" caused by acute blood loss from a gastrointestinal bleed (*id.* at 441, 443-45). She had a history of hypertension, diabetes mellitus ("DM"), mild hyperlipidemia, and "some anxiety," which was being treated with Klonopin (*id.* at 443).

On January 21, 2013, Plaintiff went to the Baystate Medical Center Emergency Room complaining of a headache, numbness on her left side, a "dead spot" in her vision, and blurred vision (*id.* at 661, 672, 675). Radiological imaging showed that she had a "transient ischemic attack" ("TIA") or a "ministroke" (*id.* at 661, 669, 673). Upon discharge from the medical center, Plaintiff was directed to: see an ophthalmologist; find a new Primary Care Physician ("PCP"); follow up with the renal doctor; "manage [her] risk factors aggressively," and "use [her] medications regularly to prevent another ministroke/stroke in [the] future" (*id.* at 670).

On January 31, 2013, Plaintiff followed up her hospital stay with Elizaveta House, N.P. of Hampden County Physicians Associates ("HCPA") (*id.* at 636, 639). The record of the visit indicates that Plaintiff's numbness "was resolved and never returned" (*id.* at 636). Her right eye

5

had a "blind spot in the center" causing Plaintiff to use her peripheral vision to see objects (*id.* at 636). Vision in her left eye was "'just blurry'" (*id.*). According to N.P. House's report, Plaintiff had a history of "poor compliance with [her] provider's recommendations" and "was discharged by her prior PCP for not following his recommendations" (*id.* at 636, 639).

The record of Plaintiff's March 14, 2013 visit to HCPA states that Plaintiff reported mild forgetfulness (*id.* at 631). Plaintiff wondered whether it was related to fatigue because she was working full-time (*id.*). N.P. House ruled out dementia based on Plaintiff's score of 29 on a mini mental exam (*id.* at 635). Plaintiff refused N.P. House's recommendation that she consult a neurologist due to an abnormal MRI and the TIA (*id.*).

On March 15, 2013, Steven J. Covici, M.D., an oculofacial plastic and reconstructive surgeon, evaluated the blind spot in Plaintiff's left eye (*id.* at 650). Dr. Covici noted that Plaintiff's eye examination "appeared within normal limits" (*id.*). A Humphrey visual field test showed "a blind spot in the inferior left quadrant in both eyes, in other words it is homonymous, which localizes posterior to the optic chasm" (*id.*). On April 12, 2013, Dr. Covici reported that Plaintiff's CT scan "showed areas of decreased attenuation in the right parietal and occipital lobes, which most likely accounts for the left homonymous scotoma [blind spot]" (*id.* at 647). Dr. Covici noted that there was "no therapy" to address Plaintiff's condition (*id.*).

N.P. House's note from Plaintiff's May 30, 2013 visit to HCPA states that Plaintiff's DM2 was "uncontrolled" due to "poor compliance with diet and meds" (*id.* at 629, 630). N.P. House stressed medication compliance for DM2 and hypertension (*id.*).

On August 31, 2013, Plaintiff visited the Noble Hospital complaining of a stabbing pain in her left ribs that radiated to the middle of her back on the left side (*id.* at 461, 463). A note says: "[Patient] lost insurance – has not taken her meds for several months – since May. Now

6

has insurance. Mass. Health" (*id.* at 461). A CT scan of Plaintiff's chest was normal with no rib fractures or pulmonary contusions (*id.* at 472). The discharge diagnosis was "[p]ossible early shingles" (*id.* at 470).

On September 4, 2013, Plaintiff visited HCPA complaining of pain that extended from her abdomen to her back (*id.* at 516). Shingles was diagnosed (*id.* at 519). N.P. House noted that Plaintiff took her DM medication and checked her glucose "infrequently" (*id.* at 516).

Plaintiff returned to HCPA five days later on September 9, 2013 complaining of left upper abdominal pain (*id.* at 512). The records state that Plaintiff did not pick up the refills of her medications that were submitted on September 4, 2013 because "she thought it could wait" (*id.*). She reported that she did not take Januvia or statin continuously as prescribed because she lost her insurance and "'tried to stretch it out due to cost'" (*id.*). On that date, Plaintiff reported that she had insurance (*id.*).

On September 10, 2013, Plaintiff had a follow-up appointment to address her DM2 and hyperlipidemia and the results of the blood tests conducted on September 9 (*id.* at 506, 509). Plaintiff was working part-time (*id.* at 506). She indicated that she had not been taking Januvia for DM2 and Rosuvastatin as prescribed (*id.* at 506, 510). N.P. House discontinued Januvia because Plaintiff's insurance did not cover it and prescribed Victoza to replace it (*id.* at 510). According to N.P. House's notes, she would prescribe Lantus if Plaintiff's insurer declined coverage for Victoza (*id.* at 497, 510).

On October 1, 2013, Plaintiff discussed her diabetes medication with N.P. House (*id.* at 497). Although Plaintiff did not get Lantus because she was told that "'her insurance does not cover it,'" she did not inform HCPA (*id.*). N.P. House reported that Plaintiff's DM2 was "uncontrolled . . . with renal manifestations" and "poor compliance" (*id.* at 500). N.P. House

provided Plaintiff with a sample of Victoza (*id.*). Plaintiff was taking Simvastatin on that date (*id.* at 497).

On October 29, 2013, Plaintiff was doing well on Victoza (*id.* at 502, 505). On November 14, 2013, Plaintiff reported to N.P. House that she checked her glucose daily and took her medication as prescribed (*id.* at 493). N.P. House noted that Plaintiff's response to Victoza was "excellent," her overall health had improved, and her compliance with medication was "good" (*id.* at 496).

The record for Plaintiff's January 14, 2014 visit to HCPA indicates that Plaintiff was using Victoza and her DM2 was well-controlled (*id.* at 488, 492). She felt good and was taking care of horses, walking her dog, and cleaning her home (*id.* at 488).

On April 24, 2014, Plaintiff reported to N.P. House that she was taking Victoza every day and had starting working part-time at a horse farm, which involved going "up and down hill most of the time" (*id.* at 550). She sometimes forgot to take her statin medication for hyperlipidemia (*id.*). She was referred to a nephrologist due to proteinuria "most likely due to [history] of [hypertension] and DM2 that was uncontrolled for many years" (*id.* at 553).

On June 2, 2014, Plaintiff had a follow-up visit with N.P. House regarding her DM2 and hyperlipidemia (*id.* at 554). The record indicates that Plaintiff had not taken Simvastatin "for an unknown period of time" and was non-compliant with her hypertension medication (*id.* at 554, 557). When N.P. House called Plaintiff's pharmacy, she learned that Plaintiff's insurance only paid for a 30 day supply of Simvastatin and Plaintiff had not called to refill her medication after she received a 30 day supply in November 2013 (*id.* at 557).

On June 18, 2014, Dennis DiCampli, M.D. of Pioneer Valley Nephrology examined Plaintiff who was referred to him for and evaluation of chronic kidney disease, specifically

elevated creatinine (*id.* at 591). Dr. DiCampli noted: "Plaintiff comes in my office and is very nonchalant. She believes she is referred here for some detectable protein in the urine. She really denies any past medical history" (*id.*). When Dr. DiCampli reviewed the Mercy Medical Center and Baystate Medical Center records, however, he found that she had "major gastrointestinal bleeding, acute myocardial infarction, cerebrovascular accident, hemoglobin A1c greater than 12.1, chronic kidney disease with creatinine of 1.1-1.4 for at least the last 3 years and significant proteinuria up to close to 2 g per day the last few years as well" (*id.*). After examination, Dr. DiCampli determined that Plaintiff had chronic kidney disease likely caused by "hypertensive [and] diabetic damage" (*id.* at 593). He recommended "aggressive medical management" but "suspect[ed] that adherence [would] be an issue" based on her "history of nonadherence [and] multiple missed appointments" (*id.*).

On July 18, 2014, Madonna M. Santos, O.D. conducted a diabetic eye examination of Plaintiff (*id.* at 586). Her visual acuity was 20/20 in both eyes and there was no retinopathy or other abnormality (*id.*).

Plaintiff visited HCPA on July 18, 2014 to get the results of a sleep apnea evaluation, which indicated that she had a "mild degree of obstructive sleep apnea" (*id.* at 559, 562, 581). Plaintiff reported her eye examination revealed that her vision was 20/20 with glasses (*id.* at 559).

Dr. DiCampli examined Plaintiff again on July 31, 2014 (*id.* at 588). He noted that Plaintiff's blood pressure was high and she seemed "rather nonchalant" about her medical issues (*id.*). Dr. DiCampli opined that she "doesn't care about her health" because she did not complete her "24-hour urine and her labs" (*id.*). He suspected that she had diuretic hypertensive nephrosclerosis and increased the dosage of amlodipine (*id.* at 588, 590).

On September 5, 2014, Plaintiff complained to N.P. House of "intermittent bilateral [foot] pain" that began in her toes and radiated to her knees when she walked (*id.* at 612, 616). At night, her feet felt like they were "on fire" (*id.* at 612). N.P. House indicated that Plaintiff's pain was likely caused by diabetic peripheral neuropathy (*id.* at 615). N. P. House prescribed cream for relief (*id.*).

On September 22, 2014, Plaintiff was experiencing right knee pain and told N.P. House that her knee "'gave out'" after she walked "a lot" at the "Big E" (*id.* at 617, 620). She reported that her pain was 5 on a scale of 10 and was more intense when she walked (*id.* at 617). An October 14, 2014 x-ray of Plaintiff's right knee revealed no "acute" conditions, but mild to moderate osteoarthritis was present (*id.* at 805).

On October 24, 2014, Plaintiff reported to N.P. House that she still had constant knee pain and recently noticed numbness in her right hand (*id.* at 621, 625). N.P. House prescribed medication for Plaintiff's knee pain (*id.* at 624). The records indicate that an EMG conducted to detect carpal tunnel syndrome was negative for the Tinel test (*id.*).

Plaintiff met with N.P. House on November 25, 2014 for a six month check of her hyperlipidemia (*id.* at 754). Plaintiff indicated that she did not skip doses of Pravastatin, but did not start Plavix, as was recommended (*id.* at 750). She offered no explanation for failing to take Plavix (*id.*). N.P. House prescribed Zetia for Plaintiff's hyperlipidemia, which had improved but was not at goal and stressed the importance of taking Plavix "to prevent [a] cardiac event" (*id.* at 753).

Plaintiff visited Dr. DiCampli again on December 4, 2014 for a follow up of her chronic kidney disease (*id.* at 785). She "did her labs" and her proteinuria and creatinine were lower

(*id.*).  However, she did not record her blood pressure readings (*id.*).  The doctor increased her medication dosage (*id.* at 787).

On March 9, 2015, Dr. DiCampli noted that Plaintiff had "[n]o complaints" was "doing well" and [c]ontinue[d] her history of nonadherence" (*id.* at 781).  She did not bring her blood pressure readings and medication list and her "labs" remained unchanged since December because she had not followed the doctor's direction to increase her medication (*id.*).  Dr. DiCampli recommended the medication dosage increase that he had advised in December 2014 (*id.* at 783).

The record for Plaintiff's March 12, 2015 visit with N.P. House describes Plaintiff as a 58 year old female whose "multiple comorbid conditions [were] stable" (*id.* at 748, 749).  The records indicate that she was "taking meds as prescribed" and was "physically active" (*id.* at 745).  She was not experiencing pain, numbness, or tingling or any symptoms of hypertension (*id.* at 745, 748).

On March 24, 2015, Dr. Covici reported that Plaintiff's "last visual field on February 24, 2015 showed the usual pattern of the scotoma, but the scotoma was deeper and larger" (*id.* at 772).  Dr. Covici was unsure whether this finding represented a "true change" and recommended repeating the test in three months (*id.*).

On May 4, 2015, Plaintiff met with N.P. House complaining of increased leg pain during sleep (*id.* at 739, 743).  She described it as a "nagging pain below the knees," but she was still able to walk (*id.* at 739).  The numbness in her feet remained the "same as usual" (*id.*).  N.P. House indicated that Plaintiff's leg pain was most likely related to diabetic neuropathy and prescribed Lyrica (*id.* at 743).  N.P. House further noted that Plaintiff had "self-stopped" her DM2 medication, Glipizide, due to "confusion, forgetfulness" and "too many pills . . . to

remember" (*id.*).  N.P. House discontinued Glipizide and increased the Lantus dosage (*id.*).

Plaintiff also reported the results of her ophthalmology appointment:  her scotoma was worse (*id.*

at 739).  She noticed that her vision had declined (*id.*).

An MRI of Plaintiff's brain that was conducted on May 5, 2015 showed:  "chronic

cephalomalacic/gliotic changes involving the right occipital lobe consistent with an old right

PCA territory infarct.  These findings coincide with the clinical history of decreased vision.

Multiple additional chronic ischemic changes [were observed].  [There was] [n]o acute ischemia"

(*id.* at 800).

On June 29, 2015, Plaintiff saw Dr. DiCampli for a follow-up visit for her chronic kidney

disease (*id.* at 777).  Plaintiff had increased her medication as directed, her blood pressure was

"excellent," and she felt good (*id.*).  Dr. DiCampli reduced the dosage of a diuretic medication

and directed oral hydration and glycemic control (*id.* at 777, 779).

During Plaintiff's July 13, 2015 visit with N.P. House, she reported feeling good (*id.* at

732, 737).  Her hypertension, high cholesterol, and cardiovascular conditions were stable, but she

was not taking her DM2 medication as prescribed (*id.* at 737).

On August 10, 2015, Plaintiff had a follow-up visit with N.P. House to check her

hypertension and DM2 (*id.* at 725).  N.P. House increased Plaintiff's Lantus dosage because her

glucose was not "at goal" (*id.* at 730).  N.P. House noted that Plaintiff "'missed'" her scheduled

vision test in July (*id.* at 725).  N.P. House also recommended that Plaintiff's pathology results

indicated that she follow up with the nephrologist (*id.* at 731).

On August 10, 2015, Plaintiff met with Dr. DiCampli who noted that she was "doing

better" but was "stressed" about her mother's illness (*id.* at 774).

C.    Plaintiff's Mental Condition

On January 31, 2013, Plaintiff reported to N.P. House that she had "chronic anxiety disorder" that was well-controlled with her current medication (*id.* at 636, 637). N.P. House noted that Plaintiff had "no anxiety and no depression," but listed "anxiety disorder NOS" in her past medical history and "adjustment disorder with anxiety" as an "active problem" (*id.* at 636-37). N.P. House noted that Plaintiff's mood and affect were "abnormal" and refilled Plaintiff's prescription for Clonazepam on that date (*id.* at 638, 639).

The record of Plaintiff's March 14, 2013 visit with N.P. House indicates that Plaintiff's anxiety was "well controlled" with her current medication, Clonazepam (*id.* at 631). Plaintiff was sleeping well and denied depression (*id.*). Because Plaintiff found that taking Clonazepam twice a day was adequate, N.P. House reduced Plaintiff's dosage (*id.* at 635). On October 29, 2013, N.P. House again noted that Plaintiff's anxiety disorder was "well controlled" with medication" (*id.* at 505).

On January 14, 2014, Plaintiff reported to N.P. House that she functioned well at home but her anxiety increased "at times" due to "some family disagreements on minor issues" that arose after her son moved back into the family home (*id.* at 488). On July 13, 2015, Plaintiff reported to N.P. House that her anxiety was "slightly worse" due to recent stress caused by her mother's terminal illness (*id.* at 732). With the exception of January 31, 2013, Plaintiffs' mood and affect were consistently reported as "normal" during visits to HCPA (*id.* at 491, 496, 500, 504, 509, 553, 557, 561, 615, 629, 634, 728, 736, 742, 748, 753).

On January 31, 2013, N.P. House noted that Plaintiff was "slightly forgetful" (*id.* at 638). On June 2, 2014, N.P. House referred Plaintiff to a neurologist based on Plaintiff's complaints of memory problems (*id.* at 557). Armand A. Aliotta, M.D., a neurologist, examined Plaintiff on July 24, 2014 (*id.* at 579). Dr. Aliotta noted that Plaintiff's "[l]anguage and memory functions"

13

were intact (*id.* at 580).  The examination did not reveal any neurological deficits, but Dr. Aliotta noted that Plaintiff's blood pressure was "somewhat elevated" (*id.*).  On August 10, 2015, N.P. House recommended that Plaintiff follow up with a neurologist because Plaintiff's "forgetfulness [was] more pronounced" during her visit to HCPA (*id.* at 730).

       D.      <u>SSA Interview</u>

An SSA employee conducted a telephone intake interview of Plaintiff on December 16, 2013 (*id.* at 245).  Plaintiff reported that "her feet [were] usually on fire at night in bed, but she denie[d] any pain or real paresthesia" (*id.*).  She stated that she was on Clonazepam for anxiety "but denied any severe [mental health] problems" (*id.*).  She indicated that her mental health issues were "stress related" and she did not see a "psych provider" (*id.*).

       E.      <u>Consultative Examination</u>

Douglas Williams, Psy.D., conducted a consultative examination of Plaintiff on October 14, 2014 (*id.* at 602).  Plaintiff, who had no history of outpatient or inpatient psychiatric treatment, drove herself to the appointment (*id.* at 602, 604).  Plaintiff reported that her mild symptoms of depression were weather related and that she had difficulty reading and performing visual tasks due to the blind spot in her left eye (*id.* at 607).  She told Dr. Williams that she did light housework, bathed and dressed herself, and prepared simple meals (*id.* at 604).

Dr. Williams reported that Plaintiff "presented generally appropriate affect and variable eye contact during the interview" (*id.*).  She did not describe any anxiety or panic attacks (*id.*).  She scored 28 out of 30 on the mini mental status examination (*id.* at 605).  Plaintiff "demonstrate[d] everyday cognitive abilities within normal expectations.  She show[ed] adequate problem solving and judgment skill, but may have relative difficulties handing complex and abstract information" (*id.* at 605, 607).  Psychological testing revealed "average functioning for

14

visual attention processing, auditory short-term memory, and visual short-term memory [and] no signs of rapid forgetting" (*id.* at 607). Dr. Williams diagnosed the following conditions: obstructive sleep apnea; status/post myocardial infarction in 2012; status/post TIA/stroke in 01-2013; left eye blind spot following stroke; DM; chronic obstructive pulmonary disease; kidney function; hypertension (*id.*).

      F.      <u>RFC Assessments</u>

          1.      State Agency Consultants

          a.      May 2014

After reviewing Plaintiff's records, Brian O'Sullivan, Ph.D., noted: "Symptoms of anxiety are credible and per [Treating Source] notes and [Plaintiff's activities of daily living they are] not severe in impact" (*id.* at 246-47). Dr. O'Sullivan stated that there was no psychiatric diagnosis in the file, only notes of the prescribing nurse practitioner (*id.* at 247).

K. Malin Weeratne, M.D., a non-examining medical consultant, assessed Plaintiff's RFC on May 9, 2014 (*id.* at 250). He indicated that she could lift 20 pounds occasionally and 10 pounds frequently, could stand and/or walk and sit for about six hours in an eight hour workday and had an unlimited ability to push and/or pull (*id.* at 248). Plaintiff had no postural or manipulative limitations, but her field of vision was limited due to scotomas in her left visual field (*id.* at 248-49). Plaintiff's only environmental limitation was to avoid concentrated exposure to hazards, such as machinery and heights (*id.* at 249-50). Dr. Weeratne found that Plaintiff had the RFC to perform her past relevant work and was not disabled (*id.* at 251).

          b.      September - October 2014

Caroline Cole, Psy.D., conducted a Psychiatric Review Technique ("PRT") assessment on October 31, 2014 (*id.* at 262). After reviewing Dr. Williams' findings from his examination

of Plaintiff, including his determination that Plaintiff had mostly average memory function and no psychological condition, Dr. Cole opined that Plaintiff did not have a medically determinable mental impairment (*id.*).

On September 10, 2014, Birendra Sinha, M.D. assessed Plaintiff's RFC and reaffirmed Dr. Weeratne's previous RFC (*id.* at 263-65).

2.     N.P. House

On November 9, 2015, N.P. House completed a medical opinion form regarding Plaintiff's ability to perform work-related activities (*id.* at 769-70).[3]  N.P. House indicated that Plaintiff's "arthritic changes" would require her to change position after sitting for twenty minutes and standing for ten minutes (*id.* at 769).  Every twenty minutes, she would have to walk for five minutes (*id.*).  According to N.P. House, Plaintiff's knee pain would prevent her from stooping, crouching, and climbing ladders (*id.* at 770).  Occasionally, she could twist and climb stairs (*id.*).  Her ability to push and/or pull was restricted (*id.*).  N.P. House indicated that Plaintiff had the following environmental restrictions:  concentrated exposure to high humidity, fumes, odors, dust, and gases; moderate exposure to extreme heat; and all exposure to extreme cold (*id.*).  In answer to a question that asked for work-related "limitations related to a mental impairment," N.P. House stated that Plaintiff's "poor vision" would impact her ability to perform work-related activities and that her impairments or treatment would cause her to miss about four days of work per month (*id.*).

G.     Function Report

---

[3] Although the signature on the form is illegible, Plaintiff does not contest the ALJ's statement that N.P. House completed the form (A.R. at 196; Dkt. No. 16 at 13-14).

On December 26, 2013, Plaintiff completed a Function Report form and a Questionnaire on Pain (*id.* at 377-86).  Plaintiff indicated that she was able to prepare meals, feed and groom her pets, perform household chores, and take care of her personal needs and grooming without reminders (*id.* at 379-81, 378).  However, she needed reminders to take medication and if she went to the store for milk, eggs, and bread she usually forgot something (*id.* at 381, 386).  She drove "sometimes," went grocery shopping about once a month, socialized about once a week, paid bills, and was able to handle checking and savings accounts (*id.* at 382, 383).  She was unable to read due to vision problems, but was able to follow verbal instructions (*id.* at 383, 384).  Plaintiff indicated that she could walk a mile before needing to rest for ten minutes (*id.* at 384).  When under stress, her heart raced and she perspired (*id.* at 385).

Plaintiff reported experiencing constant pain on the left side of her rib cage that spread to her feet (*id.* at 377).  She described the pain as feeling like "someone [was] stabbing [her] with a knife" (*id.* at 378).  According to the pain form, Plaintiff was not taking medication to relieve the pain because "insurance won't approve it" (*id.* at 377).  A bath brought pain relief (*id.* at 378).

H.    The ALJ Hearing

Plaintiff and independent vocational expert ("VE") Elaine G. Cogliano testified at the hearing before the ALJ on November 16, 2015 (*id.* at 204).  Plaintiff drove herself to the hearing (*id.* at 210).  Plaintiff described the following conditions:  high blood pressure, which caused headaches; diabetes, which caused lightheadedness, dizziness, and neuropathy in her feet making them feel like they were on fire; kidney problems associated with diabetes and high blood pressure; and blind spots in her left eye (*id.* at 216-20, 226-29).  She testified that she was unable to work because of her vision problems and "body pain" (*id.* at 224).

She was not in pain at the hearing, but described the stabbing pain in her side, the "achy" pain in her knees, which traveled down her legs, the pain in her hips, and the stiffness in her lower back, which was worse in the morning and limited her ability to bend over (*id.* at 221-22, 230-32). Her knees swelled about once a week and she wore a brace (*id.* at 230). Heat patches relieved her back pain and medication relieved her hip and knee pain (*id.* at 221-22, 232). Gabapentin relieved her diabetic pain a "little bit" (*id.* at 229). Some medication caused her to be dizzy, lightheaded, and shaky (*id.* at 222).

Plaintiff testified that she dressed and groomed herself, did laundry, and prepared meals, but took breaks throughout the day (*id.* at 223, 235). She had not spent time with horses for about a year and was not able to walk her dog due to pain (*id.* at 223-24, 236). She could sit and stand comfortably for about thirty minutes before changing position (*id.* at 232). She could slowly walk about 1,000 yards before stopping and could slowly climb and descend stairs (*id.* at 232-33).

After Plaintiff suffered a stroke, she had difficulty seeing, remembering and concentrating (*id.* at 225-26). She testified that she could only read text that was in bold print (*id.* at 226-27).

Plaintiff told the ALJ that she did not have any mental health conditions, but was taking medication for anxiety, which caused her to become "very hot" and shaky (*id.* at 220-21, 233). Confrontations with others caused her anxiety to increase (*id.* at 233-34). Being with her dog calmed her (*id.* at 234-35). At the hearing, she reported being depressed because her mother had terminal lung cancer and her brother-in-law was on life support (*id.* at 220-21). She told the ALJ that she was going to seek mental health therapy because she "broke down" during a recent visit to the doctor's office (*id.* at 222-23).

In order to determine the VE's opinion of whether Plaintiff could perform her past jobs or jobs that existed in the regional and national economy, the ALJ asked the VE to assume that a person with Plaintiff's age, education, and work experience, could engage in "light exertion which would not require binocular vision" or operation of foot or let controls (*id.* at 238). Further, the hypothetical person "should not be around dangerous moving machinery[,] . . . should not work at heights, us[e] ladders, ropes or scaffolding," should not be required to lift or reach overhead, and should be required to grasp[], pinch[] or twist[] with the hands for no more than one-third of the workday (*id.* at 239). The VE indicated that the hypothetical person could perform Plaintiff's past jobs of payroll clerk and dispatcher (*id.*). However, those jobs would not be available to a person who was absent more than four days a month or who would be off task twenty-five percent of the time due to diabetic symptoms and chronic fatigue (*id.* at 239-40).

I.      The ALJ's Decision

In determining whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations. *See* 20 C.F.R. § 404.1520(a)(4)(i-v); *see also Goodermote*, 690 F.2d at 6-7. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of June 22, 2013 (A.R. at 185). *See* 20 C.F.R. § 404.1571 *et seq.* At step two, the ALJ found that Plaintiff had the following severe impairments: DM; diabetic retinopathy of both eyes; diabetic peripheral neuropathy; anemia; hypertension; hyperlipidemia; obstructive sleep apnea; mild to moderate osteoarthritis, involving the medial compartment of the femoral-tibial joint space of the knees; chronic kidney disease, stage III with proteinuria; right distal median neuropathy consistent with carpal tunnel syndrome; osteopenia; anxiety; history of May 2012 myocardial infarction and gastrointestinal bleed; history of January 2013 TIA . . . and acute kidney injury; and left inferior visual field homonymous scotoma or

blind spot in both eyes secondary to a right parietal/occipital infarct (A.R. at 185). *See* 20 C.F.R. § 404.1520(c). The ALJ found that all of these conditions, including anxiety, "impose[d] more than minimal limitations" (A.R. at 185-86). For purposes of step three, the ALJ evaluated the following of Plaintiff's impairments: dysfunction of a major weight bearing joint (knees); sleep apnea; hypertension; impairment of renal function; diabetes and diabetic neuropathy; and TIA (*id.* at 186-87). The ALJ concluded that these conditions, either alone or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*id.* at 186). *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

Before proceeding to steps four and five, the ALJ assessed Plaintiff's RFC for use at step four to determine whether she could perform past relevant work and, if the analysis continued to step five, to determine if she could do other work. *See* 20 C.F.R. § 404.1520(e). The ALJ determined that the Plaintiff had the RFC to perform light work,[4] with the following limitations:

> [S]he cannot do a job requiring binocular vision. She cannot engage in the operation of foot/leg controls. The [Plaintiff] would need to avoid exposure to heights, ladders, ropes, scaffolding, and dangerous moving machinery. She is limited to not more than frequent grasping, pinching, and twisting with her hands. The [Plaintiff] cannot perform overhead lifting or reaching.

(A.R. at 187-88). At step four, the ALJ found that Plaintiff was able to perform her past relevant work as a payroll clerk and dispatcher (*id.* at 197-98). *See* 20 C.F.R. § 404.1565. Consequently,

---

[4] Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

the ALJ concluded that Plaintiff was not disabled from June 22, 2013 through February 26, 2016, the date of the decision under review (A.R. at 198). *See* 20 C.F.R. § 404.1520(g).

IV.    <u>ANALYSIS</u>

Plaintiff alleges that the ALJ erred by: (1) failing to consider Plaintiff's anxiety when crafting the RFC notwithstanding his step two finding that it was a severe impairment; (2) failing to give N.P. House's opinion controlling weight; and (3) finding Plaintiff not credible based on her failures to follow treatment recommendations. Each of Plaintiff's objections will be addressed in turn.

A.    <u>Remand is warranted based on the ALJ's inclusion of Plaintiff's anxiety as a severe impairment at step two while failing to assess and document the functional limitations resulting from the impairment.</u>

In view of the ALJ's step two finding that Plaintiff's anxiety was a severe impairment, Plaintiff faults the ALJ for failing to rate Plaintiff's degree of limitation resulting from anxiety as required by 20 C.F.R. § 404.1520a (Dkt. No. 16 at 8-12). In conjunction with this claim, Plaintiff points to the inconsistency between the ALJ's step two finding that Plaintiff's anxiety was severe while affording "great weight" to the opinions of the two DDS examiners who determined that Plaintiff did not have a mental impairment (*id.* at 12-13). The Commissioner responds, first, by arguing that the ALJ did not intend to include anxiety at step two and its inclusion was a "scrivener's error." If the ALJ did not make a scrivener's error, according to the Commissioner, the error was harmless because there is no requirement that the RFC include limitations for all step two "severe" impairments (Dkt. No. 20 at 8-13). The record does not support the Commissioner's contention that the ALJ made a scrivener's error at step two. Because the ALJ failed to assess the Plaintiff's degree of limitation in four broad areas of

functioning and failed to document his decision as mandated by the regulations, remand is required.

    1.      On this record, the ALJ's step two finding -- that anxiety was a severe impairment -- was not a scrivener's error.

At step two, Plaintiff bore the burden of making a threshold showing that her medically determinable physical or mental impairments, or combination of impairments, significantly limited her ability to perform basic work activities. *See Bowen v. Yuckert,* 482 U.S. 137, 153-54 (1987); *Teves v. Astrue*, Civil No. 08-246-B-W, 2009 WL 961231, at *1 (D. Me. Apr. 7, 2009), *aff'd,* Civil No. 1:08-246-JAW, 2009 WL 1211015 (D. Me. Apr. 30, 2009); 20 C.F.R. § 404.1505. Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522(b). Plaintiff's step two burden was a *de minimus* one, "designed to do no more than screen out groundless claims." *Id.* (citing *McDonald v. Secretary of Health & Human Servs.,* 795 F.2d 1118, 1123 (1st Cir. 1986)).

There was obvious record evidence that Plaintiff's anxiety was a medically determinable mental impairment. *See* 20 C.F.R. § 404.1520a(b). The records of HCPA consistently listed "adjustment order with anxiety" as one of Plaintiff's "Active Problems" and N.P. House prescribed medication (*see, e.g.,* A.R. at 636). At the hearing before the ALJ, Plaintiff testified that her anxiety was triggered by confrontations, driving, and her mother's illness (*id.* at 190, 233-34). When anxious, her temperature rose, she shook, and had "knots" in her stomach (*id.* at 190, 233).

The ALJ's findings regarding anxiety are contradictory and confusing. He found Plaintiff's anxiety to be a severe impairment at step two (*id.* at 185-86). Anxiety was among Plaintiff's severe impairments listed in the step two heading (*id.*). The ALJ also included anxiety in the next sentence, which identified conditions that caused Plaintiff "more than minimal

limitations" (*id.* at 185-86). There was no assessment of anxiety at step three and the ALJ did

not incorporate limitations caused by mental impairments into the RFC (*id.* at 186-88). In

describing the evidence that formed the basis for the RFC, the ALJ stated that N.P. House noted

that Plaintiff's anxiety was well-controlled with her current medications; Dr. O'Sullivan observed

that there was no psychiatric diagnosis in Plaintiff's records; Dr. Cole opined that Plaintiff had

"no mental impairment," including depression and anxiety; and Dr. Williams failed to "indicate

any psychological diagnosis" (*id.* at 192, 195, 196). The ALJ afforded the opinions of Drs.

O'Sullivan, Cole, and Williams "great weight" (*id.* at 196-97). In summary, however, the ALJ

stated that the RFC was "supported by the medical record," which showed that Plaintiff had

specific conditions, including anxiety (*id.* at 197).

The court rejects the Commissioner's assertions that the ALJ's step two determination that

Plaintiff's anxiety was "severe" was a "scrivener's error" (Dkt. No. 20 at 9-10). "A scrivener's

error is a transcription error or a typographical error." *Hudon v. Astrue*, Civil No. 10-cv-405-JL,

2011 WL 4382145, at *4 (D.N.H. Sept. 20, 2011) (citing cases). "In the context of social

security cases, errors in ALJ decisions have been excused as mere scrivener's errors when the

ALJ's intent was apparent." *Id. See Lamont v. Berryhill*, Case No. 2:16-cv-01418-BHS-TLF,

2017 WL 3432695, at *2 (W.D. Wash. June 28, 2017), *report and recommendation adopted,*

CASE NO. C16-1418 BHS, 2017 WL 3424855 (W.D. Wash. Aug. 8, 2017) ("[T]he ALJ

appeared to make a scrivener's error in finding asthma to be non-severe. . . . In the heading to his

step-two discussion, the ALJ did list asthma among the impairments he found severe . . . ."*);*

*Sampson v. Comm'r of Soc. Sec.*, Case No. 2:14-cv-713-FtM-MRM, 2016 WL 825536, at *4

(M.D. Fla. Mar. 3, 2016) ("The Court determines that the ALJ erred in finding at step two of the

sequential evaluation that Plaintiff had 'degenerative joint disease of the right thumb' rather than

the left thumb.  However, this error was a scrivener's error as evidenced by the RFC including limitations as to Plaintiff's left hand."); *Wearen v. Colvin*, No. 13-CV-6189P, 2015 WL 1038236, at *12 (W.D.N.Y. Mar. 10, 2015) ("A review of the record dispels any speculation that the ALJ's finding of severe knee impairment was intended to apply to [plaintiff's] right knee.  The record plainly supports a finding that [plaintiff] suffers from a severe impairment in his left knee, as demonstrated by objective medical findings.  It does not support a finding of any severe impairment in [plaintiff's] right knee, much less that he suffers from physical limitations as a result of a right knee impairment.  Accordingly, I conclude that the ALJ's reference to the right knee in the severity finding was the result of a scrivener's error and does not require remand."); *Conner v. Colvin*, No. CV-13-5033-FVS, 2014 WL 2094345, at *4 (E.D. Wash. May 20, 2014) ("Plaintiff argues the ALJ improperly rejected polycystic ovarian disease as a severe impairment at step two.  In support of this argument, Plaintiff cites to an inconsistency in the ALJ's step two analysis which first finds that Plaintiff's symptoms associated with polycystic ovarian disease 'significantly interfere with her ability to perform basic work-related activities,' but in the following paragraph finds this same impairment to be 'non-severe.' . . . However, in her briefing Plaintiff fails to acknowledge that the ALJ additionally reasoned that polycystic ovarian disease was non-severe because it was 'controlled by exercise and there is no record of it causing functional limitations.' . . . Moreover, in the subject heading of the decision addressing step two, the ALJ did not include polycystic ovarian disease as a severe impairment. . . . Thus, the court agrees with Defendant that the inclusion of polycystic ovarian disease as a severe impairment in the first paragraph addressing ALJ's step two findings was an unintentional oversight."); *Moore v. Astrue*, Civil Action No. 0:06-3514-HFF-BM, 2008 WL 216605, at *4-5 (D.S.C. Jan. 24, 2008) (although the ALJ listed plaintiff's depression as a "severe impairment," the court found

that to be a scrivener's error based the ALJ's lengthy analysis of plaintiff's depression and the "specific finding" that the impairment was non-severe).

Here, the inconsistencies in the ALJ's opinion regarding Plaintiff's anxiety prevent the court from discerning his intent as is required to find a scrivener's error. "In nearly all of the Social Security cases in which a court has concluded that an ALJ made a mere typographical or scrivener's error, the ALJ's intent was more apparent." *Douglas v. Astrue*, C/A No. 1:09-1349-CMC-SVH, 2010 WL 3522298, at *3 (D.S.C. Sept. 3, 2010) (citing cases). The ALJ did not indicate that Plaintiff's anxiety was non-severe. Instead, he twice identified it as a severe medically determinable mental impairment at step two (A.R. at 185-86). In support of the contention that this was a scrivener's error, the Commissioner points to the ALJ's omission of anxiety from the RFC based on the "great weight" he afforded to Dr. O'Sullivan's opinion that Plaintiff's mental impairment was not "severe," and Dr. Cole's and Dr. Williams' opinions that Plaintiff did not have a medically determinable mental impairment at all (*id.* at 187, 196-97). In view of the ALJ's conflicting positions, however, adopting the Commissioner's view would require the court to impermissibly speculate about the ALJ's intent. *See Senter v. Colvin*, No. C12-0343-JCC, 2013 WL 2151767, at *5 (W.D. Wash. May 16, 2013) ("[T]he assertion that the ALJ's COPD determination at Step 2 was a mere 'scrivener's error' fails because such an assumption would be speculation . . . .").

The ALJ's inconsistency in the instant case is analogous to other cases in which courts rejected the Commissioner's contentions of a scrivener's error. *See Hudon*, 2011 WL 4382145, at *4 (rejecting the Commissioner's argument that the ALJ's step three finding of three episodes of decompensation was an "obvious scrivener's error" because "the decision [did] not show that the ALJ's intent was contrary to the finding."); *Johnson v. Astrue*, No. C10-1469-TSZ, 2011 WL

3881486, at *3 (W.D. Wash. July 29, 2011), *report and recommendation adopted,* No. C10-1469-TSZ, 2011 WL 3880904 (W.D. Wash. Sept. 2, 2011) ("The Court finds it necessary to remand this case to allow the ALJ to clarify the step two findings regarding plaintiff's mental impairments. Notwithstanding the Commissioner's defense of the logic and legal sufficiency of the ALJ's step two findings, the record suggests that a scrivener's error may have led to the identification of plaintiff's ADD as a severe impairment in one portion of the decision . . . , with a seemingly contrary finding later in the decision . . . ."); *Guber v. Astrue*, No. 1:10-cv-172-JAW, 2011 WL 1253888, at *3 (D. Me. Mar. 30, 2011) (the ALJ's step two finding that plaintiff had "moderate" limitations in maintaining concentration, persistence, or pace, which contradicted the statement in the RFC that plaintiff "'is able to perform complex tasks,'" was not a scrivener's error because "it [was] not at all obvious that the [ALJ] 'meant' to make a finding [of 'mild' limitations] that might be more harmonious with his ultimate decision . . . In addition, there is nothing contradictory about the use of 'moderate' rather than the use of 'mild' as a descriptor.").

The Commissioner's reliance on *Meacham v. Astrue*, Civil No. 09-590-P-S, 2010 WL 4412113 (D. Me. Oct. 31, 2010), is unavailing. In *Meacham*, a central issue concerned whether the plaintiff's substance abuse was material to his disability. *Id.* at *2. The plaintiff claimed that the ALJ's finding that "his condition, including substance abuse, met Listing 12.08 (personality disorders), [was] inconsistent with his finding that he had no medically determinable impairment of a personality disorder . . . ." *Id.* The court found that the ALJ's determination that the plaintiff met Listing 12.08 was a scrivener's error because, in explaining that finding, the ALJ indicated that the plaintiff's mental impairments, when he was abusing drugs and alcohol, met listings 12.04 (affective disorders) and 12.09 (substance addiction disorders). *Id.* at *6. Moreover, even if the ALJ did not make a scrivener's error, the error was harmless because his determination that

plaintiff's substance abuse was material to his disability, which was supported by substantial evidence, precluded a finding of disability irrespective of whether the plaintiff met Listings 12.09, 12.04, and 12.08 or only Listings 12.09 and 12.04 when abusing substances. *Id.* Here, on the other hand, the ALJ's only specific findings regarding anxiety at step two were that it was "severe" and that it "imposed more than minimal limitations" (A.R. at 185-86). It cannot be said that the ALJ's step two determination "was inherently contradictory" and, therefore, there is no basis for finding a scrivener's error at step two. *Guber*, 2011 WL 1253888, at *3.

> 2. The ALJ's failure to comply with 20 C.F.R. § 404.1520a was not harmless.

Because the ALJ's step two determination -- that Plaintiff's anxiety was a severe mental impairment -- was not a scrivener's error, it must examine the ALJ's failure to assess and document Plaintiff's degree of limitation in each of the four functional categories, as required by the regulations, and his failure to include Plaintiff's functional limitations, if any, in the RFC. The court is not persuaded by the Commissioner's contention that this glaring omission in his analysis was harmless.

"The [Commissioner] has supplemented the familiar five-step sequential evaluation process for generally evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments." *Pratt v. Sullivan*, 956 F.2d 830, 834 (8th Cir. 1992) (citing 20 C.F.R. § 404.1520a). "[W]hen [the ALJ] evaluate[s] the severity of mental impairments . . . [he] must follow a special technique at each level in the administrative review process." 20 C.F.R. § 1520a(a). At step two, the ALJ determines whether the claimant has a medically determinable mental impairment by evaluating "pertinent symptoms, signs and laboratory findings." 20 C.F.R. § 404.1520a(b)(1). If the claimant is found to have a medically determinable mental impairment, the ALJ must "rate the degree of functional limitation resulting

from the impairment(s) in accordance with paragraph (c)," which describes "four broad functional areas." 20 C.F.R. § 404.1520a(b)(2), (c)(3). "These four functional areas [known as the 'Paragraph B criteria'] are 'activities of daily living,' 'social functioning,' 'concentration, persistence or pace,' and 'episodes of decompensation.'" *Topoulos v. Berryhill*, Civil Action No. 16-cv-11636-IT, 2018 WL 1358817, at *11 (D. Mass. Mar. 16, 2018) (quoting 20 C.F.R. § 404.1520a(c)(3)); [5] 20 C.F.R. Part 404, Subpart P, Appendix 1. "Pursuant to the social security regulations, the first three of these criteria are to be marked using a 'five-point scale: none, mild, moderate, marked, and extreme.'" *Id.* (citing *Green v. Astrue*, 588 F. Supp. 2d 147, 152 (D. Mass. 2008); citing 20 C.F.R. § 404.1520a(c)(4)). "The fourth functional area is rated on a four-point scale: '[n]one, one or two, three, [and] four or more.'" *Id.* (alterations in original) (quoting 20 C.F.R. §§ 404.1520a(c)(4)).[6] After the ALJ rates the degree of functional limitation resulting from the claimant's mental impairment, he determines its severity. *See* 20 C.F.R. § 404.1520a(d). According to the regulations, generally, if the limitations in the first three areas are "none" or "mild" and there are no identified episodes of decompensation, the ALJ will find the impairment is not severe. *See Kohler v. Astrue*, 546 F.3d 260, 266 (2d Cir. 2008) (Sotomayor, J.); 20 C.F.R. § 404.1520a(d)(1). "If the claimant's mental impairment is severe, the [ALJ] will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." *Kohler,* 546 F.3d at 266 (citing 20 C.F.R. §

---

[5] The regulation was effective from June 13, 2011 to January 16, 2017.

[6] The regulation was effective from June 13, 2011 to January 16, 2017.

404.1520a(d)(2)). If the ALJ finds that the claimant's severe medical impairment "neither meets nor is equivalent in severity to any listing," he will assess the RFC. 20 C.F.R. § 404.1520a(d)(3).

"Importantly, the regulations require application of this process to be documented." *Kohler*, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520a(e)).

> [T]he [ALJ's] written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). *The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.*

20 C.F.R. § 404.1520a(e)(4) (emphasis added). *See Teves*, 2009 WL 961231, at *1 ("If the administrative law judge determines, after evaluating the claimant's symptoms, signs, and laboratory findings, that the claimant had a medically determinable mental impairment at the relevant time, then the technique must be used and documented.").

Here, the ALJ's written decision did not include a "specific finding as to the degree of limitation in each of the functional areas . . . " (A.R. at 183-198). 20 C.F.R. § 404.1520a(e)(4). Although the ALJ did not rate the Paragraph B criteria in his step two findings as required by 20 C.F.R. 404.1520a(b), any error was harmless because the ALJ resolved step two in Plaintiff's favor (*id.* at 185-86). *See Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 658 (6th Cir. 2009) ("[T]he ALJ's failure to rate the B criteria at step two of the five-step analysis was clearly harmless [because] the ALJ ultimately concluded that [the plaintiff] had a severe mental impairment and proceeded to step three, which was all [the plaintiff] could have asked for.");

However, the ALJ failed to specifically assess the Paragraph B criteria at step three and omitted his ratings in the written decision (A.R. at 186-98). *See* 20 C.F.R. § 404.1520a(c), (e). Although the First Circuit has not decided the consequences of noncompliance with the special

technique outlined in 20 C.F.R. § 404.1520a, district courts in this circuit and other circuit courts have required remand in circumstances similar to those presented here. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 662 (4th Cir. 2017) ("[T]he weight of authority suggests that failure to properly document application of the special technique will rarely, if ever, be harmless because such a failure prevents, or at least substantially hinders, judicial review."); *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 726 (9th Cir. 2011) (ALJ's failure to document the application of the technique to include "a specific finding as to the degree of limitation in any of the four functional areas" constituted legal error necessitating remand); *Kohler*, 546 F.3d at 269 (remand required because the ALJ's failure to adhere to the regulations prevented the court from determining "whether the ALJ's decision . . . [was] supported by substantial evidence and reflect[ed] application of the correct legal standards."); *Craft v. Astrue*, 539 F.3d 668, 675 (7th Cir. 2008) (remand required because "the ALJ's failure to consider the functional impairments during the special technique analysis was compounded by a failure of analysis during the RFC determination"); *Moore v. Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005) ("We thus join our sister circuits in holding that when a claimant has presented a colorable claim of a mental impairment, the social security regulations require the ALJ to [comply with 20 C.F.R. § 404.1520a].  Failure to do so requires remand."); *Pratt*, 956 F.2d at 835-36 (same); *Hill v. Sullivan*, 924 F.2d 972, 975 (10th Cir. 1991) ("Since the record contained evidence of a mental impairment that allegedly prevented claimant from working, the Secretary was required to follow the procedure for evaluating the potential mental impairment set forth in his regulations and document the procedure accordingly."); *McDonnell v. Colvin*, Case No. 3:15-cv-30080-KAR, 2016 WL 3582001, at *5 (D. Mass. June 28, 2016) ("[R]emand of this case is appropriate for the ALJ to properly apply the law and regulations to assess the severity of Plaintiff's medically

determinable mental impairments utilizing the special technique set forth in 20 C.F.R. § 404.1520a."); *Echandy-Caraballo v. Astrue*, No. CA 06-97 M, 2008 WL 910059, at *6 (D.R.I. Mar. 31, 2008) ("[T]he ALJ's failure to document application of the special technique was legal error" requiring remand); *Slovak v. Barnhart*, No. Civ. 02-231-M, 2003 WL 21246049, at *9 (D.N.H. May 29, 2003) (same); *Alley v. Apfel*, No. 00-5-B, 2000 WL 1196336, at *2 (D. Me. June 16, 2000) (remand required because ALJ "implicitly found (and the record corroborates) that the plaintiff did suffer from a mental impairment" but the ALJ failed to comply with the regulation). *But see Rabbers*, 582 F.3d at 657 (finding failure to comply with special technique harmless, but noting that "in some cases, it may be difficult, or even impossible to assess whether the ALJ's failure to rate the B criteria was harmless.").

Remand of this matter is required because the ALJ's failure to follow the special technique required by the mental impairment regulation precludes effective review by this court. *See Kohler*, 546 F.3d at 269. First, an assessment of Plaintiff's Paragraph B criteria is necessary for the step three determination of whether or not her anxiety met or equaled a listed impairment contained in Appendix 1 to the regulations. *See Diaz v. Colvin*, Civil Action No. 14-cv-13363-IT, 2016 WL 2992909, at *4 (D. Mass. Mar. 28, 2016); 20 C.F.R. § 404.1520(a)(4)(iii).

Second, if the ALJ found that Plaintiff's anxiety did not meet or equal a listed impairment at step three, when crafting the RFC, the ALJ was required to analyze whether Plaintiff's mental impairment limited her ability to carry out work-related mental activities. *See Resendes v. Astrue*, 780 F. Supp. 2d 125, 139 (D. Mass. 2011) ("The ALJ must complete the RFC assessment based on 'all the relevant medical and other evidence in [the] case record.' This includes the claimant's testimony and evidence pertaining to even those impairments that the ALJ determined are not severe or do not meet or equal an impairment listed in the regulations.") (alteration in

original) (quoting 20 C.F.R. § 404.1520(e)); *see also* 20 C.F.R. § 404.1545(e); SSR 96-8p, 1996

WL 374184, at *5 (July 2, 1996). While the Commissioner correctly points out that an ALJ is

not required to include a step two severe impairment in the RFC, *see Huertas v. Astrue*, 844 F.

Supp. 2d 197, 204 (D. Mass. 2012) (citing *Sykes v. Apfel*, 228 F.3d 259, 268 n.12 (3d Cir.

2000)), the ALJ's finding that Plaintiff's anxiety was severe "is compatible with findings that one

or more of the B criteria is mildly or moderately affected." *Connolly v. Colvin*, No. 2:14-cv-292-

JHR, 2015 WL 1859011, at *6 (D. Me. Apr. 22, 2015). The RFC did not reflect any limitations

based on Plaintiff's mental impairment and the ALJ did not explain the basis for the omission

(A.R. at 187-88). The absence of any assessment and documentation of Plaintiff's Paragraph B

criteria precludes the court from determining whether the RFC is supported by substantial

evidence. *See Kohler,* 546 F.3d at 269; *McDonnell*, 2016 WL 3582001, at *5. *Contrast

Rabbers*, 582 F.3d at 658-60 (ALJ's written findings on plaintiff's Paragraph B criteria permitted

review and error in failing to follow the regulations was harmless). Accordingly, on remand, the

ALJ is required to follow the regulations regarding the assessment of Plaintiff's anxiety.

Because Plaintiff's other two assertions do not involve her claim of anxiety, the court will

address them.

B.      The ALJ's determination to afford Nurse Practitioner House's opinion of
        Plaintiff's physical condition "partial weight" is supported by substantial evidence.

Plaintiff contends that the ALJ should have afforded controlling weight to N.P. House's

assessment of Plaintiff's physical abilities because she was a treating source. The Commissioner

persuasively counters that N.P. House was not a treating source and that the ALJ's finding – that

N.P. House's opinion was inconsistent with her progress notes – is supported by substantial

evidence.

Under the regulations that were effective at the time of Plaintiff's application, "[o]nly licensed physicians, licensed or certified psychologists, and other 'acceptable medical sources,' . . . qualify as 'treating sources,' whose opinions generally are entitled to more weight and, under certain circumstances, can be afforded controlling weight."  *Barowsky v. Colvin*, Case No. 15-cv-30019-KAR, 2016 WL 634067, at *6 (D. Mass. Feb. 17, 2016) (quoting 20 C.F.R. §§ 404.1502, 404.1513).[7]  As a nurse practitioner, N.P. House "was not an acceptable medical source whose opinion was entitled to the weight of a treating source opinion."  *Raposo v. Berryhill*, Civil Action No. 17-cv-10308-ADB, 2018 WL 1524570, at *6 (D. Mass. Mar. 28, 2018) (citing *Reyes v. Berryhill*, Civil Action No. 16-10466-DJC, 2017 WL 3186637, at *8 (D. Mass. July 26, 2017)).  *See Campagna v. Berryhill*, No. 2:16-cv-00521-JDL, 2017 WL 5037463, at *4 (D. Me. Nov. 3, 2017) ("opinion of [nurse practitioner] was not entitled to controlling weight because a nurse practitioner is not a so-called 'acceptable medical source'") (quoting 20 C.F.R. § 404.1513(a)).

"Rather than a treating source, N.P. House was an 'other' medical source."  *Raposo*, 2018 WL 1524570, at *7 (quoting *Maio v. Astrue*, Civil No. 10-cv-235-JL, 2011 WL 2199845, at *4 (D.N.H. June 7, 2011)).  "An 'other source,' such as a nurse practitioner . . . cannot establish the existence of a medically determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function."

---

[7] *See* Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 82 Fed. Reg. 15,263 (Mar. 27, 2017) (policy interpretation ruling that nurse practitioners are not "acceptable medical sources" has been rescinded, but only effective "for claims filed on or after March 27, 2017" (emphasis added)); 20 C.F.R. § 416.902(a)(7) (nurse practitioner considered an acceptable medical source for claims filed "*on or after March 27, 2017*" (emphasis added)).  Plaintiff filed her claim on December 3, 2013 (A.R. at 183).

*Oviedo v. Colvin*, C.A. No. 15-344S, 2016 WL 5794885, at *7 (D.R.I. Sept. 2, 2016), *report and recommendation adopted,* C.A. No. 15-344 S, 2016 WL 5793653 (D.R.I. Oct. 4, 2016). "An administrative law judge need not provide 'good reasons' for discounting the opinion of a 'non-acceptable' treating source, as he or she must if addressing the opinion of an 'acceptable' treating source." *Guest v. Berryhill*, No. 2:16-cv-00228-JHR, 2017 WL 2414468, at *7 (D. Me. June 2, 2017). *See Johnson v. Colvin*, 204 F. Supp. 3d 396, 410 (D. Mass. 2016) ("The opinions of other medical sources are not entitled to controlling weight and an administrative law judge is not required to provide 'good reasons' for the weight assigned to such opinions . . . ."). The ALJ "need only 'explain the weight given to opinions from these "other sources" or otherwise ensure that the discussion of the evidence . . . allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.'" *Guest*, 2017 WL 2414468, at *7 (quoting SSR 06-3p, 2006 WL 2329939, at *6 (Aug. 9, 2006)).

The ALJ adequately explained his reason for affording "partial weight" to N.P. House's opinion regarding Plaintiff's functional limitations: N.P. House's opinion contradicted her own treatment records (A.R. at 196). *See King v. Astrue,* Civil No. 09-337-P-H, 2010 WL 4457447, at *4 (D. Me. Mar. 29, 2010) ("The administrative law judge fulfilled applicable requirements with respect to the [nurse practitioner's opinion], expressly considering it, explaining the weight afforded to it, and providing adequate discussion to enable a subsequent reviewer to follow his reasoning."). The ALJ's conclusion was supported by the records that he cited (A.R. at 196). *See* SSR 06-3p, 2006 WL 2329939, at *4 (whether an opinion is consistent with other evidence is one factor considered in weighing the opinion of a source who is not an "acceptable medical source"). N.P. House opined that Plaintiff could sit for twenty minutes, stand for ten minutes, and must walk around for five minutes every twenty minutes due to her arthritis (A.R. at 769-

70).  She also indicated that Plaintiff's decreased range of motion limited her ability to stoop, crouch, climb ladders, and push/pull (*id.* at 770).  However, these opinions contradicted N.P. House's notes from January 14, 2014 indicating that Plaintiff was "staying active" by [t]aking care of horses, cleaning, [and] walking the dog" (*id.* at 488).  On April 24, 2014, Plaintiff reported to N.P. House that she was working part-time at a horse farm and was going "up and down hill most of the time" (*id.* at 550).  On September 22, 2014, Plaintiff complained of right knee pain after walking "a lot" at the "Big E" (*id.* at 617).  On October 14, 2014, David B. Mernoff, M.D. reported that the results of Plaintiff's knee x-ray showed "mild to moderate osteoarthritis" and "[n]o acute findings" (*id.* at 805).  Nurse House's examination during Plaintiff's November 25, 2014 visit revealed that Plaintiff's "gait and station" were normal (*id.* at 753).  On March 12, 2015, Plaintiff reported that she was "physically active" (*id.* at 745).  She was able to walk on May 4, 2015 (*id.* at 739).  Plaintiff's musculoskeletal examination was normal on July 13, 2015 (*id.* at 736).  Because these records were inconsistent with N.P. House's opinion regarding Plaintiff's ability to do work-related activities, the ALJ's decision regarding N.P. House's opinion is supported by substantial evidence.  *See* SSR 06-3p, 2006 WL 2329939, at *4.

C.      The ALJ's credibility determination was supported by substantial evidence.

Plaintiff's challenge to the ALJ's credibility determination concerns only his discounting of her credibility based on her failure to be "entirely compliant in taking prescribed medications" (A.R. at 190).  According to Plaintiff, her noncompliance was excused by her lack of medical insurance (Dkt. No. 16 at 16-17).

"In determining whether [an individual] is disabled, [the ALJ] consider[s] all . . . symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as

35

consistent with the objective medical evidence and other evidence."  20 C.F.R. § 404.1529(a).  A

"symptom" is defined as "the individual's own description of his or her physical or mental

impairment(s)."  SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).[8]  The ALJ's analysis must

follow a two-step process.  *See id.*  First, the ALJ "must consider whether there is an underlying

medically determinable physical or mental impairment(s) . . . that could reasonably be expected

to produce the individual's pain or other symptoms."  *Id.* at *2.  At the second step, the ALJ

> must evaluate the intensity, persistence, and limiting effects of the individual's symptoms
> to determine the extent to which the symptoms limit the individual's ability to do work-
> related activities.  For this purpose . . . the adjudicator must make a finding on the
> credibility of the individual's statements based on a consideration of the entire case
> record.  This includes the medical signs and laboratory findings, the individual's own
> statements about the symptoms, any statements and other information provided by
> treating or examining physicians or psychologists and other persons about the symptoms
> and how they affect the individual, and any other relevant evidence in the case record.

SSR 96-7p, 1996 WL 374186, at *2.

Here, at step one, the ALJ found that Plaintiff had "medically determinable impairments

that could reasonably cause her alleged symptoms" (A.R. at 186, 188).  At step two, the ALJ

determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects

of these symptoms are not fully credible . . ." (*id.*).  The ALJ cited Plaintiff's failure to be

"entirely compliant in taking prescribed medications" as only one reason for discounting her

credibility (*id.* at 190-91).

---

[8] Social Security Ruling 96-7p applied to decisions, such as this one, which were made before
March 28, 2016 (A.R. at 198).  *See* SSR 16-3p, 2017 WL 5180304, at *1, 13 & n.27 (Oct. 25,
2017).  ALJs were directed to use SSR 16-3p instead of SSR 96-7p when making determinations
and decisions regarding a claimant's symptoms on or after that date.  *Id.*

A claimant's failure to follow treatment recommendations is a recognized factor in assessing credibility.

> The individual's statements may be less credible . . . if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.  However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

SSR 96-7p, 1996 WL 374186, at *7.  *See Coskery v. Berryhill*, 892 F.3d 1, 6 (1st Cir. 2018) (quoting SSR 16-3p, 2017 WL 5180304, at *9) ("In accord with the common-sense notion that a person who does not follow a course of treatment for pain may not be suffering from that pain as intensely as the person claims, [the regulation] expressly provides that an ALJ must "consider an individual's attempts . . . to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities for an adult or the ability to function independently.");[9] *Stimson v. Astrue*, Civil Action No. 10-30193-KPN, 2011 WL 6132025, at *5 (D. Mass. Dec. 1, 2011) (ALJ considered plaintiff's noncompliance with treatment in assessing his subjective statements); 20 C.F.R. § 404.1529(c).

---

[9] Although the court is cognizant of the fact that SSR 16-3p does not apply here, the only significant difference between SSR 96-7p and SSR 16-3p is the elimination of the term "credibility" from the new ruling.  *See Coskery*, 892 F.3d at 4 (quoting SSR 16-3p, 2017 WL 5180304, at *2 & n.1)  ("Following concerns raised by the Administrative Conference of the United States about symptom evaluation under . . . SSR [96-7p] . . . the SSA decided to 'eliminat[e] the use of the term "credibility" from [the] sub-regulatory policy' to make clear that a 'subjective symptom evaluation is not an examination of an individual's character.'") (third alteration in original).  Because "SSR 16-3p is a clarification of the previous ruling rather than a substantive change," *Nunes v. Berryhill*, Civil No. 16-CV-11499-LTS, 2017 WL 4169748, at *2 (D. Mass. Sept. 20, 2017), *Coskery's* interpretation of the credibility factors and reasoning are relevant to cases applying SSR 96-7p.

The record supports the ALJ's determination that Plaintiff did not consistently comply with treatment recommendations. According to N.P. House's note, Plaintiff's former PCP discharged her for failing to follow his recommendations (A.R. at 636, 639). The ALJ acknowledged the records in which Plaintiff reported that she sometimes forgot to take her medication, but he afforded "great weight" to Dr. Williams' opinion that, based on objective test results, her memory function was mostly in the average range (*id.* at 190-91, 196). Plaintiff correctly states that she was without insurance for a time and, even when insured, certain medications were not covered (*id.* at 461, 512). Notwithstanding these circumstances, the record reflects instances where Plaintiff had insurance coverage but failed to comply with treatment providers' recommendations (*id.* at 512, 516, 550, 554, 557, 588, 593, 725, 737, 743, 756, 781). Most importantly, the ALJ gave other acceptable reasons for discounting Plaintiff's statements about the effects of her medically determinable impairments.

The ALJ adequately explained the basis for discounting Plaintiff's credibility and his reasons are supported by the record. Accordingly, the aspect of the opinion presents no basis for a remand.

V. CONCLUSION

For the above-stated reasons, Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 15) is GRANTED in part and DENIED in part and the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (Dkt. No. 19) is GRANTED in part and DENIED in part. The case is remanded for further proceedings consistent with this memorandum and order.

It is so ordered.

Dated: October 4, 2018         /s/ Katherine A. Robertson
                   KATHERINE A. ROBERTSON

U.S. MAGISTRATE JUDGE